# Douty *et al.* versus Bird *et al.*

1. Two persons entered into partnership for mining, the lease being to one, to whom all the stock, fixtures, capital and property belonged exclusively, both being in possession. A joint action of trespass by both for injury to the mines is maintainable.

2. In trespass for breaking a dam, by which the workmen were driven from the mines by the water: Evidence of the amount each miner would produce and of the expense of keeping mules whilst the mines could not be worked is admissible on the question of damages.

3. Where there is evidence that the trespass is malicious, a court should not be too stringent in excluding evidence as to damage, but should wait and instruct the jury as to the true rule, to be given on the whole evidence.

4. McKnight *v.* Ratcliff, 8 Wright 156, explained.

January 25th 1869, at Philadelphia. Before THOMPSON, C. J., AGNEW and SHARSWOOD, JJ. Absent READ and WILLIAMS, JJ.

Error to the Court of Common Pleas of *Northumberland county*: Of October Term 1868.

This was an action of trespass *q. c. f.*, brought by John B. Douty and William H. Douty against Joseph Bird and others for breaking down a dam of the plaintiffs and doing other injury to their coal-mines.

The writ was issued to January Term 1865.

The plaintiffs declared in their 1st count that the defendants had taken and carried away trees and coal, and that "a certain earthen dam there lately being and deposited they did cut down, mine, dig and carry away," &c.; in the 2d, that the defendants took and carried away trees and coal " and one earthen dam there

[Douty v. Bird.]

being and erected, did pull down, cut, take and carry away, and also the plaintiffs' watercourses, gangways, breastworks, mines, pit-holes, air-shafts and fixtures then and there being erected and constructed, did break, stop up, pull down and destroy." The defendants pleaded "*non cul.*," and "*liberum tenementum*."

The material trespass alleged against the defendants arose under these circumstances: The plaintiffs were occupying a tract of coal-land, as lessees, under a lease from Thomas Baumgardner; Bird, one of the defendants, occupied an adjoining coal-tract under the Big Mountain Improvement Company, which was on a higher level than the plaintiffs. The parties in their mining having approached each other within 14 feet, the defendants broke through the breast of the plaintiffs and let in the water upon their works. The plaintiffs erected dams to stop the water thus let in upon them which were also broken by the defendants, and the water again let in on the plaintiffs, injuring their railroads, destroying the iron and throwing their hands and stock out of employ, imposing upon the plaintiffs the expense of wages to their hands and of keeping their stock, as well as general injury.

The plaintiffs gave in evidence a lease for eight years of the premises, consisting of coal-veins, &c., dated February 10th 1859, from Thomas Baumgardner to John B. Douty and William H. Douty, under which the lessees were to work the mines in a proper manner to their full capacity and pay the lessor at a certain rate per ton of the coal mined and sent away, and to keep the breaker and all the machinery in good working order at their own expenses. J. B. Douty, by writing endorsed on the lease, transferred to his co-lessee, W. H. Douty, all his interest in the lease.

On the 31st of March 1860, W. H. Douty and J. B. Douty entered into an agreement in writing, of which the material parts are as follows, viz.:—

"Whereas the said William H. Douty is in possession of, and is now mining, vending and selling coal at the Henry Clay Colliery, * * under an agreement of lease from Thomas Baumgardner, dated the first day of July 1859, which said lease is to continue for the term and period of eight years from the date thereof, and the said William H. Douty is sufficiently provided with money, stock, tools, effects, &c., necessary for conducting the business and trade of mining, vending and selling coal at the mines and colliery aforesaid, and the said John B. Douty being an expert, possessed of knowledge, skill and ability of, in and about the said business, &c. In consideration of the said knowledge, skill and ability of the said John B. Douty, &c., * * the said William H. Douty by these presents does agree, to and with the said John B. Douty, to associate him as a copartner in the said business of mining, vending and selling coal at the colliery aforesaid. The said John B. Douty being wholly without money, goods, wares,

10 P. F SMITH—4

[Douty *v.* Bird.]

implements or the other commodities, to invest and deliver in as stock, to be used, &c., in the said business of mining, &c. * * Therefore it is hereby agreed, by and between the said parties, and the said copartners, &c., * * in manner and form following, that is to say :—The said business of mining, vending and selling coal at the colliery aforesaid, shall hereafter, during the continuance of this agreement of copartnership between them, * * be conducted under the firm-name of William H. Douty & Co. The property, and right of property, and possession in the said lease, and in the stock, horses, mules, cars, drift-cars, tools, implements, fixtures, wares, commodities and things, at, about, belonging and necessary to, and employed at said Henry Clay Colliery (except for the necessary purposes of conducting, prosecuting and carrying on the said business of mining, vending and selling coal), to be and remain as fully, absolutely and exclusively the property and chattels of the said William H. Douty, as the same were at and before the making of this agreement of copartnership, the same stock and chattels aforesaid, nor any part thereof in nowise to become the property of the said John B. Douty, during the continuance of this agreement, nor at the termination thereof, but when this agreement of copartnership shall cease and determine, then the same property, chattels, stock, &c., is to be as exclusively the property of the said William H. Douty, as the same now is.

" The said William H. Douty covenants and agrees to pay to him, the said John B. Douty, in consideration of his knowledge, skill and ability in and about the business aforesaid, the sum of $60 per month, for every month, during the continuance of this copartnership. And after all the rents, hire, costs, expenses and charges of every kind whatsoever are fully paid, all such gain, profit and increase as shall arise by reason of said joint business of mining, vending and selling coal as aforesaid, shall, on an account taken for that purpose, at the termination of each current year, be equally and proportionably divided between the said copartners, share and share alike." * *

Richard Douty for the plaintiffs testified, that in February and March 1863, both the plaintiffs were in possession of the premises leased from Baumgardner ; they had coal-mines opened and were working them. He testified also as to the breaking through of the breast and the dams, and as to the character of the injury sustained by plaintiffs.

The plaintiffs then proposed to ask the witness what amount of coal each hand mined at their colliery per day, at or about the time of the trespass, and what quantity of coal each miner employed by them could have mined on the several days that plaintiffs were obliged to quit work and stop their operations of mining, and what amount of profits the plaintiffs could have realized on

[Douty *v.* Bird.]

each ton of coal that their said hands could have mined during the time they were delayed. This offered to prove the amount of damage sustained by the plaintiffs.

The defendants objected to the offer; it was rejected by the court, and a bill of exceptions was sealed.

There were other decisions and exceptions as to evidence, which are not material.

After the evidence had closed, the court (Jordan, P. J.) instructed the jury that the plaintiffs were not entitled to recover. The verdict was therefore for the defendants. The plaintiffs took a writ of error and assigned for error, amongst others, the instruction of the court to the jury and the rejection of the evidence contained in the plaintiffs' first bill of exceptions.

*W. M. Rockafeller* (with whom were *Hill & Wolverton*), for plaintiffs in error.—Both plaintiffs were in possession of the land; this would entitle them to recover against an intruder without right. The agreement of March 31st 1860 showed a joint interest in the plaintiffs, although John had before assigned his interest in the original lease; a joint action could therefore be maintained: 1 Chitty's Pl. 173; Foote *v.* Colvin, 3 Johns. 216. The offer in the bill of exceptions should have been admitted as containing evidence of injury necessarily resulting from the trespass: Spigelmoyer *v.* Walter, 3 W. & S. 540.

*J. B. Packer* (with whom was *W. J. Greenough*), for defendants in error.—If W. H. Douty had exclusive possession under the lease, a joint action cannot be maintained: Ward *v.* Taylor, 1 Barr 238; Greber *v.* Kleckner, 2 Id. 291; Shenk *v.* Mundorf, 2 Browne 109; Herr *v.* Slough, Id. 111; Addleman *v.* Way, 4 Yeates 218. The injury to be proved by the offer of evidence was too remote: Bryce *v.* Bayliff, 1 Camp. 85; Good *v.* Mylin, 8 Barr 56; Lowden *v.* Goodrich, Peak's C. 46; Pettit *v.* Addington, Id. 62; 2 Stark. Ev. 815; 1 Chitty's Pl. 386, 387; Rising *v.* Granger, 1 Mass. 47; Pastorius *v.* Fisher, 1 Rawle 28; Dickinson *v.* Boyle, 17 Pick. 79; Looker *v.* Damon, Id. 288; White *v.* Moseley, 8 Id. 358; Spigelmoyer *v.* Walter, *supra;* 2 Saund. Pl. & Ev. 865, Buller's N. P. 89; McKnight *v.* Ratcliff, 8 Wright 156; Fleming *v.* Beck, 12 Id. 309.

The opinion of the court was delivered, February 4th 1869, by

AGNEW, J.—There was no pretence that the trespass of the defendants was committed under any color of title. The objection to the plaintiffs' recovery was founded wholly on a supposed want of joint possession. In this, we think, there was error. In the first place, there was the positive testimony of Richard Douty, that John B. and William H. Douty were in possession of the

[Douty *v.* Bird.]

land leased of Baumgardner during the time of the alleged trespasses—that they had coal-mines opened and were working them; that both carried on the colliery business there. This proof of possession, corroborated by other witnesses, is not rebutted by the agreement of 31st March 1860 between John B. and William H. Douty. The agreement created an express partnership in the business of mining and selling coal at the colliery. It is true, the agreement provided, that the right of property and possession of the lease, and of the stock and personal property, should remain absolutely and exclusively the property and chattels of William H. Douty; but this was made subject to an express exception for the necessary purposes of conducting and carrying on of the business of mining and vending coal. The exception carried with it a limited possession, to wit, to the extent necessary to conduct and carry on the mining business. The title to the lease and personal property, and the legal possession of everything, not necessary to actual mining operations, remained in William H. Douty; but the joint possession was in both in all that was required to effectuate the purpose of the partnership in carrying on mining operations. A trespass which interrupted or destroyed these operations was clearly an injury to both, and gave them a joint right of action for redress; and to this extent the exception in the agreement let John B. into joint possession with William H. Douty. The injury alleged, was one that directly affected the working of the mines, and consequently the joint occupancy of the partners. To enter upon the land they were working, break holes into their mines, and inundate them with water from above, was an act of trespass, clearly directed against their mining operations. So far, therefore, as the acts complained of affected this joint business, thus carried on upon the premises, the plaintiffs were entitled to recover, and the court erred in withdrawing the cause wholly from the jury.

Perhaps the offer contained in the first bill of exceptions was unnecessarily broad, and comprehended more than the plaintiffs might be permitted to recover as damages, but we think the court ought not to have excluded it altogether. So far as the hands were driven from their work by the overflow of the water from above, it was an interruption caused immediately by the trespass, and to this extent there was a loss of mining operations, which could be proved. Merely speculative profits would not be allowed, but direct losses stand on a different footing. If a miner be driven from his work, the amount of coal produced by his day's labor is easily computed, and the loss on this, suffered by his employer, is not speculative but real, and is just the difference between the cost of his labor and the actual price of the coal on that day at the mine. This is the case of a wilful tort and not a contract. The defendants are presumed to know that to let down water on a

[Douty *v.* Bird.]

lower mine, and to drown it out, or partially suspend its operations, would be the immediate effect of their act. Mining operations embrace the labor of mules as well as of men; so far as this labor is used in actual mining operations, the expense of the mules while actually idle from the influx of water is a loss, which is the legitimate source of reparation in damages. These remarks refer only to a loss immediately connected with the subject of injury, falling within the direct line of consequences, and not to any general or supposed loss collateral to or outside of this line. There was evidence from which a jury might have concluded that the trespasses were malicious as well as wilful. In such a case a court should not be too stringent in holding the rules excluding the evidence as to damage, but should rather wait and instruct the jury as to the true rule to be given upon the whole evidence. At the stage of the cause when these offers of evidence were made, it would have been proper to hear the evidence, as to what hands were interrupted partially or wholly by the influx of water, how much time they lost, how much mining the plaintiffs were thereby deprived of, and all those facts which would throw light on the actual amount of injury they sustained by the trespass which had been proved. In this we do not include speculative profits, such as were condemned in McKnight *v.* Ratcliff, 8 Wright 156. In that case, the jury were told that if the mines were rendered entirely useless, the profit that might have been made on the coal would be a fair basis for estimating the damages. This was held to be entirely too vague and difficult of computation, and that the instructions should have been for the actual damage by the delay, loss of time, injury to machinery and the like; in other words, the actual loss as we have stated it, arising from the interruption to the mining operations, caused by the trespass referred to. The other errors need no notice.

Judgment reversed, and a *venire facias de novo* awarded.

WILLIAMS, J., was at Nisi·Prius during the argument of the preceding three cases.